IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| VENTURIST, INC., <br><br> Plaintiff <br><br><br><br> PAT MAUNEY, <br><br> Defendant. | ) <br> ) <br> ) <br> ) Case No. 2:06cv00494 SRW <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## DEFENDANT PAT MAUNEY'S DECLARATION IN SUPPORT OF HER MOTION TO TRANSFER VENUE

1.  I, Pat Mauney, declare that I am a party to this action, have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.  I began my employment with Venturist, Inc., in June 2000. In August 2001, I signed an employment agreement with Venturist, Inc., that labeled me as an employee and did not contain a choice of law or choice of forum clause. From June 2000 until December 2002, I was employed with Venturist, Inc., in Montgomery, Alabama. A true and correct copy of the employment agreement I entered into with Venturist, Inc. in August 2001, is attached hereto as Exhibit "A."

3.  In January 2003, I had relocated to Sacramento, California. Venturist, Inc. decided to maintain my employment relationship, despite my relocation. However, in a stated effort to avoid the application of California law, Venturist, Inc. relabeled me as an independent contractor. This modification to my employment relationship with Venturist, Inc. was odd because I still performed the same duties in California as I did in Alabama. On several

231178.1

2

occasions, I expressed my concern to John Warden, the CEO of Venturist, Inc., about their misclassification of me as an independent contractor. However, he did nothing about it.

5. Despite the fact that to my knowledge I was not an independent contractor, Venturist, Inc. did not keep track of the hours I worked. I estimate that I worked approximately 55 hours each week, while employed by Venturist, Inc., in California. I notified John Warden that I was regularly working overtime. However, I was never compensated for any overtime wages I worked.

6. In March 2003, John Warden decided to modify my compensation plan and pay me solely through commissions. I negotiated and executed this plan via electronic mail and telephone while in California. Thereafter, I aggressively marketed and assisted in selling Plaintiff's products including seminars and publications by regularly contacting current customers to assess their needs, following up on any potential customer leads, and negotiating the contract price of any seminars or publications. Despite my extensive efforts, however, Plaintiff refused to pay me for my full or partial commission on several deals.

7. During my employment with Venturist, Inc., I earned vacation in the following manner: Year 2002 – three weeks vacation; Year 2003 – three weeks vacation; Year 2004 – three weeks vacation; Year 2005 – three weeks vacation; Year 2006 – four weeks vacation. In Year 2002, I only used one week of vacation; in Year 2003, I only used two weeks of vacation; in Year 2004, I only used one week of vacation; in Year 2005, I only used eight days of vacation; and, in Year 2006, I did not use any vacation. At the time my employment with Venturist, Inc. ended in March 2006, I was not fully compensated for my accrued, but unused vacation.

8. During my employment with Venturist, Inc., in California, I do not recall ever taking a thirty minute, uninterrupted meal break in accordance with California Labor Code section 512. Accordingly, Venturist, Inc. owes me statutory meal break penalties.

9. In December 2005, the CEO of Venturist, Inc. notified me that he was changing my compensation plan because he did not want to pay me for all of the commissions I earned. He basically said that he did not ever intend for me to earn as much as I had through commissions and could not pay me for those commissions. Accordingly, he decided to change my compensation to salary. Venturist, Inc. also re-labeled me as an employee from an independent contractor, even though none of my duties for the company changed.

10. Venturist, Inc. required me to sign a new employment agreement in December 2005 to reflect this change in my compensation and my classification from an independent contractor to an employee. This contract contains an Alabama choice of law provision, even though the performance of my duties under this agreement was expected to primarily be performed in California. It also contains an unlawful non-compete provision.

11. Once my employment relationship with Venturist, Inc. ended in March 2006, I tried to informally resolve my concerns with the company regarding the unpaid commissions, the unpaid overtime, and the unpaid accrued vacation. Plaintiff ignored my concerns and filed this declaratory relief action against me in Alabama in an attempt to intimidate me and prevent me from pursuing my claims in California, where my employment with Venturist, Inc. took place.

12. I am currently unemployed and financially strained, in part, due to (1) Plaintiff's continued refusal to provide me with commissions, overtime, and unused vacation time that I am owed; and (2) Plaintiff's unlawful attempts to prevent me from seeking out any gainful employment by threatening to enforce an illegal non-compete provision contained in the

231178.1

December 2005 employment contract. Defending this action against Venturist, Inc. in Alabama has already, and will continue to create an undue financial strain on me. I simply cannot afford to pay for the travel expenses I will incur for myself and my counsel, Jennifer Barrera who resides in Sacramento, California, to attend hearings, depositions, and eventually trial in Alabama. Although I am committed to this litigation, I simply cannot financially afford to continue defending this action in Alabama.

13. In addition to the financial inconvenience litigating this case in Alabama will cause me, it will also inconvenience material witnesses to this litigation. My husband, two children, and personal friend, all of whom reside in California, have personal knowledge, to some extent, of the hours I worked during my employment with Venturist, Inc. in California. Additionally, several of the customers with whom I contacted and negotiated to sale Plaintiff's products are located in California, and have personal knowledge of the my efforts that justify the commissions I am owed. These customers include two individuals from ANG, and one individual from Pfizer La Jolla, who all reside in California. There are only two customer witnesses who reside in Alabama. The rest of the customers with whom I contacted and negotiated to sale Plaintiff's products, and therefore would have personal knowledge of my efforts that justify the commissions I am owed, are scattered throughout the United States.

14. At the time my employment with Venturist, Inc. ended in April 2006, Venturist, Inc. was a financially thriving company, in part, due to my extensive efforts in marketing and selling its products. John Warden, the CEO of Venturist, Inc., regularly traveled to various parts of the United States and even foreign countries to promote Venturist, Inc.'s products and to conduct seminars. Venturist, Inc. is more financially able to litigate this matter in California, where all of the relevant events giving rise to this litigation occurred.

231178.1

I declare under the penalty of perjury under the laws of the United States, the State of Alabama, and the State of California that the foregoing is true and correct, and that this declaration was executed on June 29, 2006 in Sacramento, California.

*Pat Mauney*
Pat Mauney

5
231178.1

EXHIBIT A

EMPLOYMENT AGREEMENT

Employment Agreement, between Venturist, Inc. (the "Company") and Patricia Mauney (the "Employee").

1. For good consideration, the Company employs the Employee on the following terms and conditions.

2. Term of Employment: Subject to the provisions for termination set forth below this agreement will begin on August 1, 2001, unless sooner terminated.

3. Salary: The Company shall pay Employee a salary of $42,000 per year, for the services of the Employee, payable at regular payroll periods.

4. Duties and Position: The Company hires the Employee in the capacity of Director, Key Accounts. The Employee's duties may be reasonably modified at the Company's direction from time to time.

5. Employee to Devote Full Time to Company: The Employee will devote full time, attention, and energies to the business of the Company and during this employment, will not engage in any other business activity, regardless of whether such activity is pursued for profit, gain, or other pecuniary advantage. Employee is not prohibited from making personal investments in any other businesses provided those investments do not require active involvement in the operation of said companies.

6. Confidentiality of Proprietary Information: Employee agrees, during or after the term of this employment, not to reveal confidential information, or trade secrets to any person, firm, corporation, or entity. Should Employee reveal or threaten to reveal this information, the Company shall be entitled to an injunction restraining the Employee from disclosing same, or from rendering any services to any entity to whom said information has been or is threatened to be disclosed. The right to secure an injunction is not exclusive, and the Company may pursue any other remedies it has against the Employee for a breach or threatened breach of this condition, including the recovery of damages from the Employee.

7. Reimbursement of Expenses: The Employee may incur reasonable expenses for furthering the Company's business, including expenses for entertainment, travel, and similar items. The Company shall reimburse Employee for all business expenses after the Employee presents an itemized account of expenditures, pursuant to Company policy.

8. Vacation: The Employee shall be entitled to a yearly vacation of 15 days at full pay in addition to Company holidays. Vacation days must be used in a given year. They may not be rolled over into the following year.

9. Disability: If Employee cannot perform the duties because of illness or incapacity for a period of more than 2 weeks, the compensation otherwise due during said illness or incapacity will be reduced by fifty percent ( 50 ) percent. The Employee's full compensation will be reinstated

upon return to work. However, if the Employee is absent from work for any reason for a continuous period of over 1 month, the Company may terminate the Employee's employment, and the Company's obligations under this agreement will cease on that date.

10. **Termination of Agreement:** Without cause, the Company may terminate this agreement at any time upon 10 days' written notice to the Employee. If the Company requests, the Employee will continue to perform his/her duties and be paid his/her regular salary up to the date of termination. Without cause, the Employee may terminate employment upon 10 days' written notice to the Company. Employee may be required to perform his/her duties and will be paid the regular salary to date of termination but shall not receive a severance allowance. Notwithstanding anything to the contrary contained in this agreement, the Company may terminate the Employee's employment upon 10 days' notice to the Employee should any of the following events occur:

a) The sale of substantially all of the Company's assets to a single purchaser or group of associated purchasers; or
b) The sale, exchange, or other disposition, in one transaction of the majority of the Company's outstanding corporate shares; or
c) The Company's decision to terminate its business and liquidate its assets;
d) The merger or consolidation of the Company with another company.
e) Bankruptcy or Chapter 11 Reorganization.

11. **Death Benefit:** Should Employee die during the term of employment, the Company shall pay to Employee's estate any compensation due through the end of the month in which death occurred.

12. **Assistance in Litigation:** Employee shall upon reasonable notice, furnish such information and proper assistance to the Company as it may reasonably require in connection with any litigation in which it is, or may become, a party either during or after employment.

13. **Effect of Prior Agreements:** This agreement supersedes any prior agreement between the Company or any predecessor of the Company and the Employee, except that this agreement shall not affect or operate to reduce any benefit or compensation inuring to the Employee of a kind elsewhere provided and not expressly provided in this agreement.

14. **Settlement by Arbitration:** Any claim or controversy that arises out of or relates to this agreement, or the breach of it, shall be settled by arbitration in accordance with the rules of the American Arbitration Association. Judgment upon the award rendered may be entered in any court with jurisdiction.

15. **Limited Effect of Waiver by Company.** Should Company waive breach of any provision of this agreement by the Employee, that waiver will not operate or be construed as a waiver of further breach by the Employee.

16. **Severability:** If, for any reason, any provision of this agreement is held invalid, all other provisions of this agreement shall remain in effect. If this agreement is held invalid or cannot be enforced, then to the full extent permitted by law any prior agreement between the Company (or any

predecessor thereof) and the Employee shall be deemed reinstated as if this agreement had not been executed.

17. Assumption of Agreement by Company's Successors and Assignees: The Company's rights and obligations under this agreement will inure to the benefit and be binding upon the Company's successors and assignees.

18. Oral Modifications Not Binding: This instrument is the entire agreement of the Company and the Employee. Oral changes shall have no effect. It may be altered only by a written agreement signed by the party against whom enforcement of any waiver, change, modification, extension, or discharge is sought.

Signed this 2nd day of August, 2001.

*Betsy W. Wicker*
Company

*Patricia Mooney*
Employee